## PHILADELPHIA SUBURBAN TRANSP. CO. v. SMITH.

### Civ. A. No. 10981.

United States District Court
E. D. Pennsylvania.

June 27, 1952.

Morse Garwood, Philadelphia, Pa., John P. Lipscomb, Jr., Washington, D. C., for plaintiff.

Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., Thomas J. Curtin, Asst. U. S. Atty., Philadelphia, Pa., Lester L. Gibson, Dept. of Justice, Tax Division, Washington, D. C., for defendant.

CLARY, District Judge.

The factual situation evidenced by the Stipulation of Facts filed in this case and the testimony at hearing discloses that plaintiff herein, a corporation of the Commonwealth of Pennsylvania, operates a transportation system in suburban Philadelphia. Its employees for several years

have numbered about six hundred. In 1943, one of the Railroad Brotherhoods representing the employees, as part of its collective bargaining agreement with the Company, prevailed upon the Company to install a Pension and Retirement Plan for its employees in order to provide a retirement income for each eligible employee. The details of the Plan are not important to a decision in this case and are, therefore, not set out.

Copies of the Plan were submitted under appropriate Statutes and Regulations to the Commissioner of Internal Revenue. On July 28, 1944, the Commissioner ruled that the Plan, effective as of January 1, 1943, met the requirements of Section 165(a) of the Internal Revenue Code, 26 U.S.C. § 165(a). In its submission for the approval of the Plan the Company included not only a description of the Plan but also the annuity table, interest and mortality assumptions used in determining its cost. It also included that the level annual premium method was being used, showing the total amount of the annual premiums for all employees included in the Plan. Because of these disclosures the Company erroneously assumed that in approving the Plan the Commissioner had also approved the method of funding.

A review of the taxpayer's income and excess profit tax returns for the calendar years 1943 and 1944 was made by an Internal Revenue Agent and based upon a Departmental Bulletin of June 1, 1945 (promulgated by Joseph D. Nunan, then Commissioner of Internal Revenue), for the year 1943, $79,907.42 out of $138,545 contributed by the Company to the Pension Trust was disallowed as an excessive amount legally deductible under appropriate Statutes and Regulations. For the year 1944, $6,754.53 out of $64,856.58 contributed by the Company to the Pension Trust was disallowed as an excessive amount legally deductible. Thereupon, under date of November 18, 1946, the plaintiff herein belatedly requested specific approval of the Commissioner of its method of funding, pointing out that it had assumed that the Bureau's ruling letter approving the Plan had also approved the method of funding.

Under date of January 6, 1948 the Commissioner refused to approve the method of funding for reasons hereinafter discussed. A deficiency was assessed, paid by the taxpayer, and this suit is to recover the deficiency paid.

The Statute involved is Section 23 of the Internal Revenue Code, Title 26 U.S.C. § 23(p) (1) (A), which reads as follows:

"(p) Contributions of an employer to an employees' trust or annuity plan and compensation under a deferred-payment plan.

"(1) General Rule. If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under subsection (a) but shall be deductible, if deductible under subsection (a) without regard to this subsection, under this subsection but only to the following extent:

"(A) In the taxable year when paid, if the contributions are paid into a pension trust, and if such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 165(a), in an amount determined as follows:

"(i) an amount not in excess of 5 per centum of the compensation otherwise paid or accrued during the taxable year to all the employees under the trust, but such amount may be reduced for future years if found by the Commissioner upon periodical examinations at not less than five-year intervals to be more than the amount reasonably necessary to provide the remaining unfunded cost of past and current service credits of all employees under the plan, plus

"(ii) any excess over the amount allowable under clause (i) necessary to provide with respect to all of the employees under the trust and remaining unfunded cost of their past and current service credits distributed as a

level amount, or a level percentage of compensation, over the remaining future service of each such employee, as determined under regulations prescribed by the Commissioner with the approval of the Secretary, but if such remaining unfunded cost with respect to any three individuals is more than 50 per centum of such remaining unfunded cost, the amount of such unfunded cost attributable to such individuals shall be distributed over a period of at least 5 taxable years, or

"(iii) in lieu of the amounts allowable under (i) and (ii) above, an amount equal to the normal cost of the plan, as determined under regulations prescribed by the Commissioner with the approval of the Secretary, plus, if past service or other supplementary pension or annuity credits are provided by the plan, an amount not in excess of 10 per centum of the cost which would be required to completely fund or purchase such pension or annuity credits as of the date when they are included in the plan, as determined under regulations prescribed by the Commissioner with the approval of the Secretary, except that in no case shall a deduction be allowed for any amount (other than the normal cost) paid in after such pension or annuity credits are completely funded or purchased.

" *    *    *    *    *    * "

The Treasury Regulation issued pursuant to the provision of that Statute and pertinent to a decision in this case is Treasury Regulations 111, Section 29.23(p)–6, approved March 8, 1943, which reads as follows:

"The level amount or level percentage of compensation under clause (ii) of section 23(p)(1)(A) may be determined by any reasonable and generally accepted actuarial method selected by the employer. While the need for actuarial calculations is implicit in clause (ii), the statute leaves the determination of specific methods to regulations to be prescribed by the Commissioner with the approval of the Secretary. Clause (ii) must be construed in the light of its obvious relationship to clauses (i) and (iii) and the interplay of clauses (i), (ii), and (iii). Each employer desiring to fund under clause (ii) shall submit the proposed method to the Commissioner and receive approval of such method before the results will be acceptable. Any method which does not fund cost of past service credits more rapidly than that permitted under clause (iii) will be acceptable, and the approval of the Commissioner will not be necessary in such a case.

"If the total costs computed under clause (ii) exceed the amount allowable under clause (i), the amount allowable under clause (ii) will be the excess of such total cost over the amount allowable in clause (i). In other words, if a deduction is claimed under clause (ii), the total amount allowable under both clauses (i) and (ii) will be the total cost for the year with respect to either the 'level amount' basis or the 'level percentage' of payroll basis."

The record before me indicates that the Plaintiff Company had for many years, through individual action by its Board of Directors, made a custom of placing aged employees upon a direct pension of the Company to prevent them from becoming public charges. Apparently a large number of the employees had been with the Company many years since some fifty-three out of a total of less than three hundred eligible for original inclusion in the Plan were of an age where their normal retirement dates would be prior to January 1, 1953. It is because of this large number of employees eligible to retire within ten years and the cost of funding their benefits under the level annual premium method that the disallowance was made by the Commissioner and that is the basis of the present suit.

█  The Company in inaugurating the Plan secured the services of the best actuarial firm of which it had knowledge. This firm explained to the Officers and the Board of Directors of the Company alternate methods of setting up the Plan, i. e.,

the level annual premium method and the so-called "aggregate" method. Funding of the level annual premium method would be under clause (ii) of the Statute and Regulations and the aggregate method would be funded under clause (iii). The Officers and Board of Directors of the Company decided that, since the level annual premium method would more readily fund its complete obligations to its employees, plus the additional fact that the Company was then enjoying extraordinarily good business due to gas rationing, the level annual premium method should be employed. Actuarial calculations and assumptions were then correlated and the Plan set up on that basis, disclosure of which was made, as above stated, to the Commissioner in the letter asking for its approval. No calculations were made by the actuary to compare costs as between the level annual premium method and the aggregate method. The Bulletin of June 1, 1945, above referred to, implemented the regulations contained in Treasury Regulations 111 by indicating the trend of official opinion of the Bureau of Internal Revenue in the administration of Section 23(p) and particularly as to allowable deductions. As pointed out in the foreword of that Bulletin quoted in the case of Saalfield Publishing Company v. Commissioner of Internal Revenue, 11 T. C. 756, 762, the Bulletin did not have the force and effect of a Treasury Decision and did not commit the Department to any interpretation of the law not formally approved and promulgated by the Secretary of the Treasury.

The action of the Commissioner in this case, however, in refusing on January 6, 1948 approval of the method of funding employed by the taxpayer clearly indicates the reason for his refusing to approve as the more rapid funding under clause (ii) than under clause (iii). The pleadings and proof in this case show clearly that the Commissioner of Internal Revenue considered clause (iii) as a limitation upon clause (ii) and that the Statute and Regulations in force did not permit any more rapid funding under clause (ii) than that permitted under clause (iii).

The case of Saalfield Publishing Company v. Commissioner of Internal Revenue, supra, is dispositive of that issue. In that case the taxpayer had contributed $37,471.41 in 1943 under its Pension Plan to pay the premiums for that year of annuity contracts purchased for its employees, which was the exact amount needed and used for that purpose. The taxpayer claimed the entire amount as a deduction under Section 23(p) (1) (A) (i, ii). The Commissioner in determining the deficiency allowed $30,938.17 of the amount claimed and disallowed the difference of $6,533.24 as a deduction for 1943. The Tax Court of the United States in a decision by Judge Murdock, which decision was reviewed by the court with no dissents, held that the position of the Commissioner that clause (iii) was a limitation upon clause (ii) was untenable and expressly against the intent of Congress as revealed in the legislative history of the Act. The court further held that Section 29.23(p)–6 of Regulations 111, above quoted, if applied so as to limit by clause (iii) amounts deductible under clause (ii) to be null and void.

With the decision of Judge Murdock and the Tax Court, I fully agree. Clause (iii) cannot in light of the legislative history of the 1942 Revenue Act be considered in anywise a limitation upon clause (ii) except in the one special situation provided by the Congress that should the remaining unfunded cost with respect to any three individuals be more than 50% of such remaining unfunded cost the amount of such unfunded cost attributable to such individuals must be distributed over a period of at least 5 taxable years. The first defense raised, therefore, on behalf of the Commissioner of Internal Revenue must be dismissed.

The Commissioner of Internal Revenue in this case has raised a novel defense not presented and not considered in the Saalfield case, supra. The Commissioner contends that the Code under clause (ii), above quoted, provides only for distributing any excess over the amount allowable under clause (i) "necessary" to provide with respect to all employees under the trust, the

remaining unfunded cost of their future and current service credits on a level basis under the remaining future services of each such employee; that the method used by the taxpayer was to distribute an amount "estimated" to be the cost of each covered employee separately under the remaining future service and then to sum the separate amounts. He argues that this does not precisely meet the provisions of the Code in that the amounts were not actually "necessary" for the purposes of a sound pension trust. He points out that the law and regulations vest solely in the Commissioner the right and duty of approval of any funding method. He contends the amounts involved in the taxpayer's method of funding were an excessive and unreasonable portion of the total estimated cost of the plan, because (a) "after the fact" proof of the operation of the fund showed that the fund would have been solvent with lesser funds, (b) that the totals paid in the first two years would have met the pension cost for those eligible for retirement in the two taxable years and would have left $26,000 in the fund for all remaining employees, (c) that the amounts funded in the first year 1943 were more than twice as large as the amounts funded in any of the ensuing 5 years.

As a corollary to the above, the Commissioner charges that the level premium method was not a generally accepted plan commonly used in pension trusts of this sort and further that the assumptions used by the actuaries were entirely too conservative, placing a much higher cost than was actually necessary to adequately fund the trust. Specifically he charges that the actuary did not take into consideration certain assumptions required under the 1948 amendment to Treasury Regulations 111.

There were only four witnesses produced at the trial of the case, three on behalf of the plaintiff and one on behalf of the defendant. Plaintiff's President, Merritt H. Taylor, testified generally regarding the institution of the Plan. He admitted very freely that the choice of the level annual premium method was made for two reasons. First, that the Company would

thereby meet its entire obligations to its employees and, secondly, that the economic status of the Company was such that it was enjoying a period of high earnings and the Officers and Directors felt it to be a sound business practice to extinguish the employee indebtedness in a period of high earnings rather than being faced with an extended indebtedness in a period when earnings could not reasonably be expected to be high.

The next witness produced was Kenneth H. Ross, an actuary and a member of the partnership of Huggins & Company, actuaries. Mr. Ross testified that he had been engaged by the plaintiff to set up the Pension Trust. He confirmed the testimony of Mr. Taylor that after outlining possible methods of setting up the Trust, he had proceeded to set it up on the annual level premium basis at the direction of Company and its Officers. On cross-examination he testified that he had never calculated the cost of the aggregate method because it was not indicated in this case. The substance of his testimony is that the Plan he used is a generally known and recognized Plan and that the assumptions which he used, while conservative, were not excessively so. He pointed out that he had not made allowances for Social Security benefits which were assumed to be payable but which, in fact, were not. He further testified that had he taken that assumption into consideration, the cost each year would have been substantially higher than the sums actually used and would have undoubtedly more than offset the requirements of the assumptions as to nonretiring and resigned employees, assumptions required to be considered in the Treasury Department Regulations of 1948.

John B. St. John, an expert actuary, supported Mr. Ross' statement that the assumptions used were not too conservative and testified that he felt, if anything, they were too liberal, and that he would use more conservative assumptions than those used by Mr. Ross.

Albert E. Kripke, the only witness for the defense, Chief of the Actuarial Unit in the Pension Trust Section of the Income Tax Division of the Bureau of Internal

Revenue, testified that in his opinion the assumptions used were entirely too conservative and made the cost much higher than was necessary for any sound Pension Trust Plan. He testified that the level annual premium method was adapted for small enterprises from fifty employees down, that it might be used but with some difficulties (which difficulties did not impress the Court) in medium sized establishments with employees running into a few hundred, and that above this number of employees the aggregate method was definitely indicated. He classified the present Plan as in the medium group. He further testified without explanation that in arriving at the assessment of the deficiency the Commissioner had used certain empirical factors not disclosed which he, the Commissioner, felt would be fair both to the taxpayer and the Government. His testimony clearly indicated that this calculation was based upon the alternate method of clause (iii) and not on clause (ii).

■ The consensus of the testimony of the three actuarial experts was that actuarial science is an inexact science. All three testified that the level annual premium method was a known method in the science and that where it was contemplated, as in the Saalfield case, that individual insurance contracts be purchased for each employee, the method was a generally recognized and used one. The instant Trust Plan gave to the Trustees the right to make such purchases if in the judgment of the Trustees such a procedure was advisable. The testimony, however, reveals that this is a self-insured Plan and that no such contracts have ever been actually purchased although in contemplation at the time of the institution of the Plan. The testimony further indicated that as between practising actuaries there is quite a bit of secrecy about methods so that it would be impossible for any individual practising actuary to give accurate statistics as to the number of times this method was used in Pension Plans. The one witness probably best qualified to give statistics, Mr. Kripke, did not give the Court the benefit of any special knowledge which he

might have had in that regard. Specifically each of the two practising actuaries testified that they had personal knowledge of other actuaries using the level annual premium method in Plans of this sort. From the testimony I must conclude, therefore, that the level annual premium method was in the then state of the actuarial science a well known and recognized method of funding Pension Trust Plans. Furthermore, I find that it was a reasonable method.

■ While the amounts in the first two years allocated to the Pension Trust Fund were very substantial, the argument of the Commissioner that they were excessive based on subsequent events does not appeal to me. Because of a fortunate increase in the value of property and securities assigned to the Pension Trust, the Trustees were able to sell some of the property and securities of the Trust at a substantial profit within the first seven years. In two of those seven years it was not necessary for the Company to turn over any money whatever to the Pension Trust Fund. In those years all earnings of the Company were taxable at highest rates, both as to income and excess profits, and to that extent the Government profited. The Court is asked to view this case in the light of "after the fact" events to substantiate the position of the Commissioner that the "estimated" amounts assigned to the Pension Trust were not "necessary" for the sound fiscal operation of the Plan. That I cannot do.

■■ I find that the assumptions used by the taxpayer and revealed to the Internal Revenue Bureau long before this controversy arose were based on sound actuarial principles. They represented the best judgment obtainable by the taxpayer at that time and, consequently, were "necessary" within the meaning of the Statute and Regulations. Nor do I feel that this case should be viewed either in the light of the Supplemental Bulletin of June 1, 1945 or the Amended Treasury Regulations of 1948. It must be decided under the Revenue Act of 1942 and the Regulations of 1943. The taxpayer in his disclosed calculations followed both sound actuarial and

business principles. That future events have proved that the Company could have had a sound pension system with lesser contributions is not in my opinion controlling. Actually, and I find this as a fact for purposes of appellate review, the Trust would have been adequately funded with lesser contributions. But the deductions taken in 1943 and 1944 by the taxpayer were at the time in accordance with both law and regulations and consequently the action of the Commissioner in disallowing any part thereof was in error.

Since the Stipulation of Facts provides that certain allowances and adjustments must be made in favor of the Government in the event of a judgment for the plaintiff in this case, counsel for the plaintiff will submit an Order for Judgment in favor of the plaintiff making due allowance for the adjustments provided for in the Stipulation of Facts.