ALABAMA DISPLAYS, INC.

v.

The UNITED STATES.

KENTUCKY DISPLAYS, INC.

v.

The UNITED STATES.

TUSCALOOSA ADVERTISING, INC.

v.

The UNITED STATES.

Nos. 155–70 to 157–70.

United States Court of Claims.

Dec. 18, 1974.

Leonard D. Van Slyke, Jr., Hatties-burg, Miss., for plaintiff; James P. Knight, Jr., Jackson, Miss., attorney of record.

Kenneth R. Boiarsky, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and NICHOLS and KASHIWA, Judges.

OPINION

KASHIWA, Judge:

Plaintiffs are three corporations related through common stock ownership and the three suits were consolidated. These suits are for the recovery of federal corporate income taxes and interest, plus statutory interest, in the amounts and for the fiscal years below:

| | Fiscal Year Ended | Tax | Assessed Interest | Total |
|---|---|---|---|---|
| Alabama | July 31, 1967 | $6,244.03 | $629.52 | $6,873.55 |
| Displays | July 31, 1968 | 585.70 | 23.91 | 609.61 |
| | | $6,829.73 | $653.43 | $7,483.16 |
| Kentucky | Oct. 31, 1967 | $ 309.80 | $ 26.74 | $ 336.54 |
| Displays | Oct. 31, 1968 | 3,183.37 | 83.77 | 3,267.14 |
| | | $3,493.17 | $110.51 | $3,603.68 |
| Tuscaloosa | Oct. 31, 1966 | $1,342.57 | $196.44 | $1,539.01 |
| Advertising | Oct. 31, 1967 | 2,705.79 | 233.55 | 2,939.34 |
| | Oct. 31, 1968 | 749.66 | 19.73 | 769.39 |
| | | $4,798.02 | $449.72 | $5,247.74 |

We hold for the plaintiff in each of the suits for the reasons hereinafter stated. The material facts are jointly stipulated by all parties to the suits.

All plaintiffs are in the business of erecting, maintaining, and renting outdoor advertising displays, commonly known as billboards. These billboards are of the type commonly seen along public highways. The billboards display advertising of the products and services of plaintiffs' customers, who rent billboard space from plaintiffs. The billboards owned by plaintiffs are constructed on property leased to plaintiffs by the property owners. These leases provide for the erection and maintenance of billboards on the subject property in exchange for an annual consideration to the property owner. The terms of the leases range from an initial period of one to five years with a renewal provision of a similar term to a period of indefinite duration which may be terminated by the property owner with 15 to 60 days' notice when the space is required for other uses, or may be terminated by the lessee under certain conditions or at any time with 15 to 60 days' notice. The leases provide for the removal of the billboards by the lessee upon termination.

Plaintiffs' contractual arrangement with their advertising customers is made on a standard form which basically provides for the display of an advertising message of a certain design on plaintiffs' billboards in exchange for a specified monthly consideration. The advertising portion of plaintiffs' billboards ranges in dimensions from six feet by twelve feet to twelve feet by fifty feet, and each billboard houses from one to four advertisements. The dimensions of the most commonly used advertisement, referred to in the trade as "standard size," are twelve feet by twenty-five feet.

The billboard base structures consist of three types:

(1) *Wood poles.* These poles range in height from 25 feet to 50 feet and for the standard size are customarily 40 feet in height. All are treated with creosote to protect the wood. The 40-foot poles are about 23 to 25 inches in circumference (7 to 8 inches in diameter) at the tip and about 37 to 40 inches in circumference (11 to 12 inches in diameter) at a distance of 6 feet from the butt. The poles are set between 7 and 8 feet in the ground. Three of them are used in a typical poster board (25 feet in width) and six of them in a typical paint board (40 to 50 feet in width). The poles in some of the displays are strengthened by the addition of concrete mixture in the hole into which each pole is inserted.

(2) *Steel I beams.* Such beams are usually 40 feet in length and extensions are sometimes added by varying lengths up to 20 feet, depending upon the desired height of the board. The width of the beams ranges from 14 to 16 inches. The 40-foot beams are set in concrete foundations between 8 and 10 feet deep. Between two and four beams are used in a typical structure.

(3) *"A" frames.* These frames consist of 17-foot lengths of angle iron measuring 2 inches x 2 inches x ¼ inch for the support of the display, and these supports meet at one point to form a rough letter "A." The supports are welded to eight anchors consisting of 2-inch pipe driven 3 to 4 feet into the ground.

Of the billboards purchased or constructed during the years at issue, the following are the approximate percentages mounted by using the above methods:

| Plaintiff | Wood Poles | I Beams | "A" Frames |
|---|---|---|---|
| Alabama | 99% | 1% | |
| Kentucky | 15% | 22% | 63% |
| Tuscaloosa | 99% | 1% | |

The removal of plaintiffs' billboards is accomplished in the following manner. The sign portion of the billboards is disassembled prior to the removal of the

supporting poles or beams and the salvageable parts are removed to the shop and inserted where practicable into other signs. All wood poles or steel beams set in concrete mixture or in concrete foundations are either cut off at or just below ground level or are left standing for use by the property owner, if requested. Wood poles not set in concrete mixture or in concrete foundations are pulled from the ground. "A" frames are removed by severing the support poles from the anchor by acetylene torch.

Plaintiffs filed corporate income tax returns for each of the years in issue and claimed the investment credit on the billboards described above. Adjustments were made by the Internal Revenue Service disallowing, *inter alia,* the investment credit so taken; and deficiency assessments were thereupon made and collected. Timely claims for refund were filed and formally rejected by the Internal Revenue Service on December 12, 1969. The petitions in these cases were filed on May 15, 1970.

The cases were ably briefed and argued by the respective counsel and the issue before us is one of construing a section of the investment credit provision of the Internal Revenue Code of 1954. The question before us is, as the Government puts it:

Whether plaintiffs' advertising displays are inherently permanent structures and therefore fail to qualify for the investment credit as "tangible personal property," and if so, whether these advertising displays also fail to qualify for the investment credit as "other tangible property" since they are not used as an integral part of furnishing communications services.

Provisions dealing with the investment credit have been a part of the federal tax law since 1962. Those involved here are sections 38, 46, and 48.[1] The amount of the credit has been 7 per cent of the qualified investment. This qualified investment is the applicable percentage of section 38 property placed in service by the taxpayer during the taxable year, the percentage varying with the useful life. In determining whether the advertising displays in issue are qualified for the investment credit, we have to look at § 48(a)(1) to determine if they are section 38 property. To be such property they have to fall under either § 48(a)(1)(A), tangible personal property, or § 48(a)(1)(B), other tangible property. Section 48 as pertinent herein reads as follows:

§ 48. Definitions; special rules.

(a) Section 38 property.—

(1) In general.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *.

\* \* \* \* \* \*

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.

We hold that these displays fall under § 48(a)(1)(A) as "tangible personal property" for the reasons stated below. Therefore, it is not necessary to rule whether the displays are "other tangible property" under § 48(a)(1)(B) and whether this business involves furnishing communications services.

The term "tangible personal property" is not defined in the statute. In the usual case there is no difficulty with relation to what "tangible personal property" means. For example, in a recent case [2] where the property involved was

---

1. All statutory references are to the Internal Revenue Code of 1954, as amended.

2. Walt Disney Prods. v. United States, 480 F.2d 66 (9th Cir. 1973), cert. denied, 415 U.S.

motion picture negatives, the court had no difficulty in determining that such property was "tangible personal property." But problems have risen where personal property is attached to realty, as in the present case. Fortunately, we are aided by recent decisions interpreting what the language means with relation to personal property attached to realty.

In Morgan v. Commissioner, 52 T.C. 478, 482–483 (1969), aff'd per curiam, 448 F.2d 1397 (9th Cir. 1971), involving floating docks attached to pilings, the court stated as follows:

> The only issue for decision is whether the floating docks and the pilings on which they ride with the tides qualify as "tangible personal property" within the meaning of sections 48 and 179.

> \*     \*     \*     \*     \*     \*

Respondent contends that the floating docks, together with the pilings, are inherently permanent land improvements within the meaning of the foregoing provisions in respondent's regulations. We do not agree. The reference to docks in respondent's regulations does not contemplate structures such as the floating docks under consideration in the case at bar.

The evidence presented at the trial established that the floating docks are not inherently permanent structures. The Court reached the same conclusion upon making a personal inspection of the docks. They float on the water as independent units, rising and falling with the tide. The purpose of the pilings is only to limit lateral motion of the docks. The docks are portable. *They can readily be removed and placed in other locations or configurations.* For instance, finger units of different lengths can be interchanged. An existing section of walkway and accompanying finger units can be moved to a new location in the same basin while remaining part of the

same complex of floating docks. As for moving the docks to new locations, that can be accomplished by towing them on the water. Most of the pilings would not necessarily have to be first removed.

Respondent takes the position that the floating docks are inherently permanent structures because they are permanently attached or affixed to land. Respondent sets forth three methods in which the docks are so attached. The first is by gangways which are hinged to permanent piers on shore and rest on the floating docks by means of rollers. The second method is the connection of electrical and plumbing utilities to the docks from land-based sources. The third is the attachment of the docks to pilings.

Respondent mistakenly assumes that annexation to land precludes classification of property as "tangible personal property" under section 48. Respondent's regulations even describe various kinds of property which are considered "tangible personal property" even though they are annexed to the ground:

> "Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. \*  \*  \*" [Emphasis supplied.]

In Minot Federal Savings and Loan Ass'n v. United States, 435 F.2d 1368, 1371 (8th Cir. 1970), the Eighth Circuit holding that movable non-load bearing building partitions retained their character as tangible personal property instead of being part of the building with which used stated as follows:

> \*  \*  \*  It is argued that because these partitions are movable they only

934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974). Also, see Madison Newspapers, Inc., 47 T.C. 630 (1967); Millers Nat'l Ins. Co., 54 T.C. 457

(1970); and Lockhart Leasing Co., 54 T.C. 301 (1970).

serve the same purpose as an inner wall and, therefore, constitute a structural component of the building. We do not agree as we can find nothing in the language Congress used or in the Treasury Regulations that supports this approach. It would seem at least to us that, when Congress in the Act separated "tangible personal property" from "other tangible property" in the disjunctive and then made each "section 38 property," the plain intendment of the Congress was to include *all tangible personal property* and *some tangible property* that might not ordinarily or by state law be included in "section 38 property."

This would be the most logical conclusion and the most reasonable one in the light of the object of the Act which is to increase investments and encourage modernization of the facilities so as to improve the country's economic potential by reducing the net costs of acquiring new equipment, all of which would help unemployment, tend to alleviate our balance of payment problem and by reducing costs help our industries' competition in markets at home and abroad.

The Act of 1962 which conceives the investment credit provision with which we are concerned was amended in 1964 by adding subparagraph (C) to § 48(A) and (B) of the Act. The effect of this amendment was to include escalators and elevators in the property to be included as eligible for investment credit. See 1964–1 (Part 2) Cum.Bull. 159–160. This gives a clear insight into the Congress' view as to what should be included in section 38 property. Certainly if escalators and elevators are to be included, there can be no doubt that movable wall partitions should be likewise included.

■ We agree with the court in *Minot* that, with relation to the question of whether structures are inherently permanent improvements, the provision must be liberally construed especially where Congress by subsequent amendment specifically extended the investment credit to include elevators and es-

calators. Furthermore, the Senate Report No. 1881, 87th Cong., 2d Sess., 1962–3 Cum.Bull. 703, 722, specifically states that "Tangible personal property is not intended to be defined narrowly here, nor to necessarily follow the rules of State law."

Treas.Reg. § 1.48–1(c) (1964) states that " * * * the term 'tangible personal property' means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures * * *. Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property." The regulation continues by stating that " * * * such property as * * * neon and other signs * * * contained in or attached to a building, constitutes tangible personal property for purposes of the credit allowed by section 38."

The *defendant refers* to the Technical Explanation of the Bill, H.R.Rep.No. 1447, 87th Cong., 2d Sess., 1962–3 Cum. Bull. 501, 517, which states that:

> * * * Thus, for example, section 38 property would ordinarily not include such assets as pavements, parking areas, *advertising displays,* outdoor lighting facilities, or swimming pools which, although used as a part of the overall business operation, are not used directly in the specified activities. [Emphasis supplied.]

Defendant's position is that the advertising displays are not tangible personal property because the Technical Explanation refers to "section 38 property" instead of limiting itself to "other tangible property" and the grouping of advertising displays with the other items indicates that Congress considered them to be of a permanent nature.

We do not agree with the defendant. The explanation above quoted is presented in the context of what constitutes "other tangible property." Also this sentence is preceded in the Technical Explanation by the sentence, "In order to qualify for the credit, property (*other than tangible personal property* and research or storage facilities used in the

specified activities) must be used as an integral part of one or more of the *specified activities."* [Emphasis supplied.] Treas.Reg. § 1.48–1(d)(4) (1964) refers to property other than tangible personal property and in listing the items of property not falling in this category, the regulation does not refer to "section 38 property." The regulation states that property such as that listed is not ordinarily used as an integral part of the types of activities indicated in Treas.Reg. § 1.48–1(d)(1) (1964), such as furnishing communications services. We think that the mention of advertising displays here is in the context of what constitutes "other tangible property."

Defendant also argues that the wooden poles here are similar to the pilings in *Morgan* on which no investment credit was allowed. The standard size 40-foot poles here are about 23 to 25 inches in circumference at the tip and about 37 to 40 inches in circumference at 6 feet from the butt. They are set between 7 and 8 feet in the ground. The pilings in *Morgan* were approximately 38 inches in circumference and set as deep as 15 feet into the mud. We do not think the two fact situations are similar. The pilings were of a permanent nature, to be left for a long period of time. They improved the land in that the land with the water above it could be used for docking. The taxpayers owned the land as well as the pilings so also there was no agreement for removal of the pilings. In the present case, the signs were on other person's properties and there was an express written understanding of removability. These facts distinguish the *Morgan* case with reference to its pilings from the case before us.

The stipulation of facts indicates that the signs are movable, that a lessor's action could necessitate plaintiffs' relocation of a sign, and that signs have been regularly moved in the past. Referring to inherently permanent structures, the items listed in Treas.Reg. § 1.48–1(c) (1964), buildings, swimming pools, etc.,

are all items placed in the ground in a permanent fashion. They seem to encompass a much longer span than the useful lives of these signs and much more permanent attachment than is made here. The displays are not inherently permanent structures and do not otherwise improve the land.

As an added argument on the question of whether the displays lost their character as personal property when affixed to real estate, plaintiffs cite the case of Helvering v. Atlas Life Insurance Co., 78 F.2d 166 (10th Cir. 1935). There the taxpayer wished to avoid income tax on rents received from tenants occupying a building constructed by the taxpayer on land leased from a state agency. The lessee's argument was that the building became part of the real estate and since the owner of the land was a state agency, the rental income should be tax exempt. The Tenth Circuit held that since the taxpayer and the state agency had agreed that the structure remained the property of the lessee, that agreement was controlling. The building would be treated as personal property of the taxpayer even though affixed to the real estate. In the case before us, the displays remained at all times plaintiffs' property with the obligation to remove the displays upon termination of their leases. See, also, Bangor-Hydro Electric Co. v. Johnson, 226 A.2d 371 (Sup.Ct.Me. 1967); Garrison General Tire Service, Inc. v. Montgomery, 75 N.M. 321, 404 P.2d 143 (1965); Zangerle v. Standard Oil Co. of Ohio, 144 Ohio St. 506, 60 N.E.2d 52 (1945); and Western Union Telegraph Co. v. Burlington & Southwestern Ry., 11 F. 1 (8th Cir. 1882).

Various revenue rulings indicate types of property which the Commissioner has accepted as qualifying as tangible personal property. Propane tanks installed on customers' premises,[3] bank vault doors and drive-up teller's windows,[4] fuel tanks, a diesel generator, exhaust equipment,[5] wall-to-wall carpeting in a motel's public and guest rooms[6] were section 38

---

3. Rev.Rul. 69–602, 1969–2 Cum.Bull. 6.

4. Rev.Rul. 65–79, 1965–1 Cum.Bull. 26.

5. Rev.Rul. 70–103, 1970–1 Cum.Bull. 6.

6. Rev.Rul. 67–349, 1967–2 Cum.Bull. 48.

property if the useful life requirement was met. These types of property are more inherently permanent than the displays because of their relation to the overall and continued use of the property to which they were attached. The court in *Minot* was much influenced by the fact that Congress deemed elevators permanently attached to the building as tangible personal property in holding that the walls in issue in that case must be tangible personal property.

For the foregoing reasons, we hold that all of plaintiffs' advertising displays in all three cases are tangible personal property under § 48(a)(1)(A) and, therefore, the investment credit should be allowed. The amount of recovery will be determined in further proceedings under Rule 131(c).

## CONCLUSION OF LAW

Upon the foregoing opinion, the facts as stipulated by the parties, the briefs and oral argument of counsel, the court concludes as a matter of law that the plaintiffs are entitled to recover in each of their respective suits and judgment is entered to that effect. The amount of recovery in each case will be determined in subsequent proceedings pursuant to Rule 131(c).