In re TRIPLE A SUGAR CORPORATION, Debtor.

TRIPLE A SUGAR CORPORATION, Plaintiff,

v.

STANDARD ELECTRIC COMPANY, et al., Defendants.

Bankruptcy No. BK 77–63ND.
Adv. No. 78–62.

United States Bankruptcy Court, D. Maine.

Sept. 11, 1981.

Jeremiah D. Newbury, Pierce, Atwood, Scribner, Allen, Smith & McKusick, Portland, Me., for debtor.

P. Benjamin Zuckerman, Verrill & Dana, Portland, Me., for Creditors' Committee.

Thomas M. Brown, Eaton, Peabody, Bradford & Veague, Bangor, Me., for Chicago Bridge & Iron.

## MEMORANDUM OPINION

CONRAD K. CYR, Bankruptcy Judge.

Chicago Bridge & Iron Company [CBI] asserts a lien for labor and materials furnished in the erection of two huge storage tanks for Maine Sugar Industries [MSI] on land owned by Aroostook Development Corporation [ADC] and later acquired by Triple A Sugar Corporation [Triple A], the Chapter XI debtor in possession. CBI claims a lien against the tanks, but not the land on which the tanks are situated,[1] on the basis of the following language of title 10 M.R. S.A., section 3251: "If the owner of the building has no legal interest in the land on which the building is erected or to which it

---

1. The recorded lien certificate purports to assert a lien against both land and buildings.

is moved, the lien attaches to the building. . . ."[2] CBI contends that the tanks were the property of MSI, although the land belonged to ADC. Triple A maintains that the tanks constitute fixtures and therefore belong to the owner of the land. Consequently, says Triple A, MSI was not "the owner of the [tanks]," within the meaning of section 3251.[3]

On December 14, 1968, CBI entered into an agreement with MSI for the sale and assembly of two tanks at the MSI refinery site in Easton, Maine. The tanks were prefabricated to specification for use in the storage of chemicals,[4] delivered as large steel sheets, and welded together at the refinery site between December 16, 1968 and April, 1969. The tanks were erected some 600 to 700 feet away from and were not connected with the refinery building itself. Piping, some of it underground, connected the tanks to a pumping and a mixing station being constructed by MSI while the erection of the tanks was in progress. The pumping station, consisting of four pumps in a small building, pumped the chemicals 200 feet from a railroad siding to the tanks for storage, and from the tanks about 300 feet to the mixing station. The mixing station, where the chemicals were weighed, mixed with water to form liquid fertilizer, and loaded onto trucks for delivery to contracting farmers, consisted of 10 vats on scales set on concrete pads.

MSI was the lessee of the land on which the tanks were erected, having conveyed the property to ADC in July, 1965 and leased it back from ADC for a twenty-five year term. ADC mortgaged the property, in July, 1965, to First National Bank of Boston, Small Business Administration, and Northern National Bank, Trustee, and again on April 4, 1969. CBI recorded its lien certificate on June 6, 1969 and filed a complaint in the Maine Superior Court to preserve and enforce its lien on June 25, 1969.

■ The principal difficulty the court has with the positions put forth by the parties stems from their apparent assumption that MSI, though admittedly not the record owner of the land on which the tanks were erected, had "no legal interest in the land on which the [tanks were] erected." On the contrary, MSI had a long-term leasehold interest in the real estate. The principal thrust of section 3251, as evidenced by its opening sentence, makes clear that the "legal interest" of which the quoted language from the second sentence of section 3251 speaks was not intended to exclude leasehold interests in land on which buildings are erected.

> Whoever . . . furnishes labor or materials . . . in erecting . . . a . . . building . . . by virtue of a contract with or by consent of the owner [of the building], has a lien thereon and on the land on which it stands and on *any interest* such owner [of the building] has in the same. . . .[5]

The inchoate CBI lien attached to whatever interest MSI had in the tanks and in the

---

2. Title 10, Maine Revised Statutes Annotated, section 3251 provides in pertinent part:

> Whoever performs labor or furnishes labor and materials . . . used in erecting, altering, moving or repairing a house, building or appurtenances . . . by virtue of a contract with or by consent of the owner, has a lien thereon and on the land on which it stands and on any interest such owner has in the same, to secure payment thereof, with costs. *If the owner of the building has no legal interest in the land on which the building is erected or to which it is moved, the lien attaches to the building. . . .*

Me.Rev.Stat.Ann., tit. 10, § 3251 (1980). (*Emphasis added.*)

3. *See* note 2 *supra.*

4. The contract called for two cone-roofed tanks; one 132' × 40' with a 400-million gallon capacity and one 93' × 40' with a 200-million gallon capacity.

5. Me.Rev.Stat.Ann., tit. 10, § 3251 (1980). (*Emphasis added.*)

From statehood until 1857, the statutory lien covered claims for labor or materials furnished in the construction or repair of a building only if furnished under a contract with the owner of the land. *Marshall v. Mathieu et al.,* 143 Me. 167, 170, 57 A.2d 400 (1948). In 1857, the statutory lien law was liberalized to protect

land, viz., the leasehold, "from the moment labor or materials [were] first provided." *Lyon v. Dunn*, 402 A.2d 461, 463 (Me.1979).

We turn next to a determination of the status of these tanks as fixtures. The tanks constitute fixtures if it appears from proven facts and circumstances and by reasonable inference that MSI intended to incorporate them as a permanent part of the premises. *Wedge v. Butler*, 136 Me. 189, 190, 6 A.2d 46 (1939). *See Cumberland County Power and Light Co. v. Hotel Ambassador*, 134 Me. 153, 157, 183 A. 132 (1936); *Roderick v. Sanborn*, 106 Me. 159, 163, 76 A. 263 (1909). The requisite intent is best determined through recourse to the three-point test articulated in *Bangor-Hydro Electric Co. v. Johnson* ;[6] that is, personal property is not a fixture unless

1) it is physically annexed, at least by juxtaposition, to the realty or some appurtenance thereof; 2) it is adapted to the use to which the land to which it is annexed is put, or the chattel and the real estate are united in the prosecution of a common enterprise, and 3) it was so annexed with the intention on the part of the person making the annexation to make it a permanent accession to the realty.[7]

Physical annexation, either actual or constructive, is an essential element in the transformation of a thing from chattel to fixture. *Bangor-Hydro Electric Co. v. Johnson*, 226 A.2d 371, 376, 378 (Me.1967); *Hayford v. Wentworth*, 97 Me. 347, 350, 54 A. 940 (1903). While minimal physical annexation may suffice, the method and extent of the annexation bear upon the inten-

tion permanently to attach, which the law deduces from external facts. *Readfield Telephone & Telegraph Co. v. Cyr*, 95 Me. 287, 290, 49 A. 1047 (1901). The parties agree that the tanks were united with the land, having been set upon sand platforms and connected by piping to other fixtures, such as the pumping and mixing stations. *See Parsons v. Copeland*, 38 Me. 537, 544 (1854). But the legal significance of the physical annexation of the tanks is seen as minimal by CBI, inasmuch as the tanks may be removable without damage to the freehold. The inevitability of injury to the freehold upon removal of the thing attached has been considered a clear indication of an intention permanently to annex, *see Hayford v. Wentworth*, 97 Me. 347, 350–51, 54 A. 940 (1903), whereas evidence of the unlikelihood of injury to the freehold upon removal is not conclusive evidence of lack of annexation, *see id.* at 353,[8] 54 A. 940. The physical character of the annexation is not determinative of a permanent annexation. *Id.* at 351, 54 A. 940. *See Bangor-Hydro Electric Co. v. Johnson*, 226 A.2d 371, 376 (Me.1967).

The second element of the fixture test is whether the goods are adapted to the existing use of the land, or the chattel and realty are united in the prosecution of a common enterprise. *Id.* at 378. The site upon which the tanks were erected was devoted to refining sugar beets grown by local farmers. The chemicals stored in the tanks were converted into liquid fertilizer for sale to beet growers upon whom the refinery was dependent for its supply of raw product. The clear purpose and actual use of the tanks

---

claims for labor or materials furnished for a building on the land of another, so as to reach "any interest the owner of the building might have in the land." *Id.* Finally, in 1883, the Legislature expanded the lienable interest to include a building whose owner has no interest in the land. *See* Publ.L. c. 232 (1883).

**6.** 226 A.2d 371 (Me.1967).

**7.** *Id.* at 375 (quoting from 97 Me. at 350, 54 A. 940).

**8.** Whether a thing is a fixture does not always depend upon the manner in which it is attached to the freehold. Its character is often indicated by the uses and purposes to which it is devoted. Doors and blinds which may be easily removed from the buildings, with which they are connected, are nevertheless a part of them. They are component and necessary parts of them, and are intended to be used as such.

*Corliss v. McLagin*, 29 Me. 115, 116 (1848).

were complementary to the entire refinery enterprise.[9] *See* note 8 *supra*.

■ The character of the physical annexation, as well as the compatibility of the uses to which the chattel and the freehold are devoted, indicate the intention governing annexation. The nature of any interest held in the freehold by the party making the annexation is another important circumstance to be considered in evaluating the intention with which the annexation was accomplished. *See Fischbach & Moore, Inc. v. Presteel Corp.*, 398 A.2d 397, 400 (Me.1979); *Bangor-Hydro Electric Co. v. Johnson*, 226 A.2d 371, 377 (Me.1967). Where title to both the realty and the thing annexed were held in common there arises a presumption that the chattel became a fixture upon annexation, *id.*, while, as a general rule, tenant chattels remain personalty on the theory that the limited term of the tenant makes it improbable that the tenant would readily relinquish title without consideration.[10] *See id.* The tenant-chattel presumption is rebuttable. *See Fischbach & Moore, Inc. v. Presteel Corp.*, *supra* at 399–400. Tenant chattels which cannot be removed without damage are fixtures, *Readfield Telephone & Telegraph Co. v. Cyr*, 95 Me. 287, 290, 49 A. 1047 (1901); *Tyler v. Fickett*, 75 Me. 211, 213 (1883), as are goods attached without the consent of the mortgagee, *Gaunt v. Allen Lane Co.*, 128 Me. 41, 47, 145 A. 255 (1929). The circumstances of the present case rebut the tenant-chattel presumption.

First, the sheer scale of the problems posed by any attempt at piecemeal removal of these huge structures,[11] which would necessitate acetylenic cutting and dismantlement even to salvage, augurs against their anticipated disassembly and persuades strongly of an original intention that they remain part of the realty.

Second, there is no evidence that CBI obtained the consent of the various real estate mortgagees before the tanks were erected at the refinery. *See id.* at 46–47, 145 A. 255 (1929). *See also* Me.Rev.Stat. Ann., tit. 33, § 455.

Third, and most important, the lease between ADC and MSI provided that the MSI lease payments were to defray the payments required to satisfy the ADC mortgage indebtedness due the First National Bank of Boston, upon satisfaction of which MSI would once again become the record owner of the realty. MSI was not the typical tenant. It perceived from the outset that it would ultimately resume ownership of the realty. These facts negate any presumption that MSI did not intend to annex the tanks permanently. *Cf. Hemenway v. Cutler*, 51 Me. 407, 408 (1863) [property annexed by mortgagor or holder of bond for deed becomes fixture]; *Tyler v. Fickett*, 75 Me. 211, 213 (1883) [property annexed by occupant under contract to purchase real estate becomes fixture].

■ The court holds that the tanks became fixtures upon their physical annexation. How then, Triple A inquires, can MSI be considered the "owner" of the tanks within the meaning of the first two sentences of section 3251?[12] The "owner" of the tanks, within the meaning of section

---

9. CBI maintains that the mixing, sale and distribution of liquid fertilizer went beyond the scope of the terms of the MSI–ADC lease, which restricts usage of the land to the purposes enumerated in 10 M.R.S.A. § 703(3), which permits an agricultural enterprise to engage in the "manufacturing, processing, assembling or preparing for market of raw materials or other products...." Me.Rev.Stat.Ann., tit. 10, § 703(3)(A) (1980). The statutory license is ample to permit the uses for which these tanks were designed and to which they were in fact put.

10. The inference of an intention permanently to annex strengthens with the likelihood that the useful life of the thing annexed does not extend beyond the leasehold. *See Parsons v. Copeland*, 38 Me. 537, 547 (1854).

11. *See* note 4 *supra*.

12. *See* note 2 *supra*.

3251, in my judgment must mean the party obligated for their cost at the time the labor and materials were first furnished, *cf. Lyon v. Dunn*, 402 A.2d 461, 463 (Me.1979), not the record owner of the land upon which the tanks were affixed. There is no sound reason to preclude a lien upon the tanks, even if considered fixtures, merely because the "owner" of the tanks has less than a fee simple interest in the land. The construction urged by Triple A would preclude the creation of a lien under either the first or second sentence of section 3251, since neither sentence becomes operative unless MSI was the "owner" of the building. In these circumstances a tenant who contracts for the erection of a building on land occupied by him under a long-term lease is the "owner" of the building for the balance of the term of the lease, within the meaning of section 3251, even if the building be considered a fixture.

The court concludes that the inchoate CBI lien attached to the tanks and to the leasehold interest of MSI "from the moment labor or materials [were] first provided," *see Lyon v. Dunn*, 402 A.2d 461, 463 (Me.1979), notwithstanding the fact that the materials supplied by CBI became fixtures upon annexation.