### TEXAS INSTRUMENTS, INC.

v.

### UNITED STATES of America.

### Civ. A. No. 3–7795–F.

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 20, 1976.

William E. Collins, Buford P. Berry, Dallas, Tex., for plaintiff.

Howard Weinberger, Dept. of Justice, Tax Div., Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT W. PORTER, District Judge.

### I. THE NATURE OF THE CONTROVERSY

This action was commenced in the United States District Court for the Northern District of Texas by the Plaintiff, Texas Instruments (TI), to recover from the Defendant, the United States of America, refund of the income taxes and assessed interest collected from the Plaintiff for its taxable years ending December 31, 1968 and December 31, 1969 as follows:

|                      | 1968           | 1969           |
| -------------------- | -------------- | -------------- |
| Principal amount of tax | $3,791,521.00 | $4,604,088.00 |
| Assessed interest    | 748,829.06     | 896,691.65     |
| Total                | $4,540,350.06  | $5,500,779.65  |

The total amount in suit by virtue of these collections is $10,041,129.71 plus statutory interest. Plaintiff timely filed consolidated income tax returns for the taxable years ending December 31, 1968 and December 31, 1969, using the accrual method of accounting. Subsequent to their filing, the returns were audited by representatives of Internal Revenue Service (Service) and certain deficiencies were assessed. Following payment of the deficiencies by the Plaintiff under protest and the disallowance of its claims for refund, Plaintiff filed this suit which was heard by the Court, without jury commencing March 24, 1975.

For reasons set forth below, the Court finds that the Plaintiff is entitled to deductions made to its employee pension trust during the years 1968 and 1969,
that credits taken by Plaintiff ostensibly pursuant to the Investment Tax Credit under Sections 38, 46, 47 and 48 of the Internal Revenue Code of 1954 (hereinafter referred to as Code or IRC) were properly disallowed, that the Plaintiff may not use the double declining balance method for deduction on certain intangible property, and finally that the Plaintiff is entitled to carry over certain foreign tax credits under Section 1503(b) of the Code.[1]

### II. JURISDICTION

So long as a claim for refund is first made through the proper administrative channels and those efforts fail, this Court is granted jurisdiction to consider further relief in tax refund cases under 28 U.S.C. § 1346. See, e. g., *Stoller v. United States*, 444 F.2d 1391 (5th Cir. 1971); *Bear Valley Mutual Water Co. v. Riddell*, 493 F.2d 948 (9th Cir. 1974). The Service urges that the Plaintiff failed to assert one of its grounds for recovery at the administrative level and therefore this Court is without jurisdiction to consider that point. This Court disagrees.

■ Plaintiff seeks recovery from the United States for taxes imposed on contributions to a qualified employee pension plan. In the administrative proceedings below, Plaintiff claimed entitlement to a refund, arguing that the deductions for such contributions were allowed under Section 404(a). Nevertheless, the Service asserts that Plaintiff must raise not only the particular section but also the specific subparagraph under which it is entitled to a refund in order to apprise the Commissioner of the tax-

---

1. Plaintiff filed, at or about the time this lawsuit was being tried, an additional claim for refund for the year 1968 dealing with a foreign tax credit that was not considered. This Court has agreed to hold that matter open, as well as the matter of a refund of taxes from the nation of Equador which Plaintiff received in 1969, and which would effectively reduce its foreign tax credit for that year. The Court will continue to hold these two ancillary matters in abey-

ance, being advised that the parties will have no controversy with respect thereto, and only final administrative consideration is required. Final action on those ancillary matters will be taken by the time a final judgment is entered in this case; otherwise, this Court will understand that the parties have stipulated that no court action will be brought on the above matters in the future.

payer's grounds for recovery. Section 404(a) provides in part that:

> If contributions are paid [to a qualified pension trust] . . . they shall be deductible under *this section*. (emphasis supplied).

By claiming entitlement under Section 404(a) it is the Court's opinion that the Plaintiff adequately apprised the Service of the grounds on which it relied.[2] Subparagraphs A, B, and C of Section 404(a)(1), are not the operative parts of Section 404; they are merely limitations on the executory deduction language contained in 404(a). Therefore this Court concludes that the Service was given adequate notice of both the law and the facts giving rise to Plaintiff's arguments for refund when Plaintiff made its claim under 404(a) without reference to the limitations under subparagraphs A, B or C. Since the administrative proceedings failed to resolve the controversy, Plaintiff may now invoke the jurisdiction of this Court on all grounds previously brought to the Commissioner's attention, including any basis for recovery under subparagraphs A, B, or C.

### III.  THE FACTUAL SETTING

Plaintiff, Texas Instruments, is a corporation organized under the laws of the State of Delaware, with its principal place of business in Dallas, Texas. During the taxable years in suit, the Plaintiff was the owner of all of the outstanding stock of several subsidiary corporations, including Metals and Controls, Inc., a Massachusetts corporation (which in 1969 became Texas Instruments, Inc.), Geophysical Service, Incorporated, a Delaware corporation; and Geophysical Service, Inc., a Nevada corporation.

### A.  THE PENSION TRUST DEDUCTION

*SCOPE AND STRUCTURE OF THE PENSION PLAN.* Plaintiff and its subsidiaries have established a qualified pension trust under Section 401 of the Internal Revenue Code for the benefit of their 23,000 employees. Pursuant to the Pension Trust Agreement the sole custody of all trust assets as well as investment and management responsibility for the trust rests with trustees who are authorized to appoint, remove and act through investment counsel for the benefit of the trust. During the years 1968 and 1969 Republic National Bank of Dallas and the Chase Manhattan Bank of New York were retained to provide investment counseling for the fund.

The Pension Trust Agreement places the administrative responsibility of the trust in a retirement Committee composed of not less than five participants. The basic responsibility of the retirement committee is to construe the trust as it relates to the rights of the participants. Beyond that, the retirement committee is also responsible for appointing an actuary to provide the necessary expert advice to the committee on uncertain variables affecting the performance of the pension plan. From 1959 through 1967 the TI Pension Trust retained the services of the Connell Company to compute the basis for the actuarial assumptions underlying the funding scheme for the trust. In 1967 the actuarial services of Connell Company were terminated and those of A. S. Hansen, Inc. were engaged. The reason for this change was a need felt by TI to enlist the services of a national firm with local offices so that closer contact and supervision of actuarial services of more recognized prestige would be possible. With TI's change in actuarial firms came a change in the underlying assumptions used in computing the contributions needed to fund the trust. Under Connell Company's management the various actuarial assumptions which entered into such computations [the rate of investment returned,[3]

---

**2.** Further supporting the fact that Plaintiff was apprised of the proper section in this case are statements by the Service made to TI upon disallowance that "the contribution does not satisfy the conditions of Section 162 of the Internal Revenue Code *and is not deductible*

*under Section 404(a)(1) of the Internal Revenue Code.* (emphasis supplied).

**3.** In 1967, while still using Connell Company, TI changed its investment prediction from 3.5 to 4.0 percent. The change was made on the

employee turnover, salary progression, and the like] had been based upon industry-wide averages rather than the Plaintiff's own unique experience. Under the Hansen Company's tutelage the Plaintiff's experience was surveyed and found to be different in several respects. On the basis of those new findings Hansen Company reasoned that in 1968 $7,024,-962.00 would have to be contributed to the trust fund and in 1969 that amount would have to rise to $7,618,715.00 to provide for anticipated payment of benefits valued at $183,732,137.00 and $204,-114,142.00 for the years 1968 and 1969, respectively.

*THE DIFFERENT ACTUARIAL METHODS.* The threshold step in making a valuation, such as that made by the Hansen Company for TI, is a determination of the present value on a given date of benefits to be paid over varying periods of time in the future to company's employees after retirement. An actuarial method is then used to determine the contributions to be made by the employer.

The resulting amount the employer is required to contribute is only an approximation of what actually may be needed to fund the trust. Significant uncertainties concerning future events are of necessity constructed into the basic assumptions used to value the contributions. Those uncertainties include such items as the return which can be expected on invested funds, the expenses of administering the plan and trust, and the amounts and timing of benefits to be paid with respect to employees. The interest rate is an expression of the average rate of earnings that can be expected on the pension funds invested or to be invested to provide for future benefits under the plan. Costs of administration which must be considered are, for example, the various trustees', actuarial, attorneys' and accounting fees. Included in the determination of the benefits which ultimately must be paid under the pension plan

are such variables as the employee salary progression, the distribution of the total package of employee remuneration between present salary and future retirement, the life of the employee, and the number of employees who will otherwise leave the plan without receiving its benefits.

Once the various significant variables of the plan are identified and reduced to statistically probable values a present value of future benefits can be computed. The next step in funding a pension trust is to apply an actuarial cost method to the present value to determine the contributions to be made by the employer for each particular year. There are several acceptable actuarial methods. This case involves two of the most commonly accepted of those methods. One is the *aggregate method.* The other is the *entry age normal method.* Both methods come within a broader classification, sometimes referred to as a projected benefit cost method, under which the entire cost of an employee's projected benefits are assigned to past, present and future periods.

Under the entry age normal method there is first computed the normal cost for a particular year. Normal cost is generally considered to be the current year's cost of maintaining the pension fund. Those costs are computed on the assumption that every employee entered the plan at the earliest time possible under the trust agreement and that contribution has been made from that beginning point in time. Theoretically, the yearly contributions would be constant amounts which if accumulated at a specified rate of interest would result in a trust equal to that required to fund the retirement for those employees who survive until that time. Since normal cost is determined on the assumption that there have been prior contributions, an assumption which is generally inaccurate given the fact that employees are hired at different times, it is necessary under

basis of its own investment experience and was only reviewed not changed by Hansen Company after it entered the scene. The 4.0

percent figure was commonly used in the actuarial industry, at the time of the change.

the entry age normal method to compute past service costs on that group of employees who do not enter the program at the plan's creation. "Past service costs", is the rubric used to denote those contributions which were not made by the employee because of his late entry into the plan. Hence the annual contribution under the entry age normal method is comprised of two components: the normal cost and unfunded past services cost. The past services cost may be reduced by contributions equivalent to the interest on the unfunded balance of past services cost and an amount intended to reduce the principle amount of the unfunded balance.

The aggregate method is also classified as a projected benefit cost method, but differs from the entry age normal method in that there is no separate computation of past services cost. The thrust of the aggregate method is to fund the total benefits due under the program at some future point in time over the remaining working life of each employee. Because the aggregate method does not assume a specified entry point into the program but rather takes the "real" entry point or actual hiring date of each employee, there is no need to finance any "past" costs or contributions which could have been made had the employee started at some earlier point in time.

*TEXAS INSTRUMENTS' EXPERIENCE.* In years prior to 1968 the Plaintiff had made larger contributions than were necessary to fund its pension plan, resulting in the trust having assets larger than its accrued liability in both 1968 and 1969, a condition referred to as "overfunded".[4] The amount by which Plaintiff's assets exceeded its accrued liability was 50.5 and 45.9 percent respectively for the years 1968 and 1969. Yet Plaintiff continued to make contributions which, according to the Defendant, manifests a blind adherence to an actuarial method without any regard for the results generated by its application. The overfunding, *i. e.* assets exceeding liabilities, was caused by underestimating the rate of return on the pension investment and overestimating the turnover rate of TI's employees. Evidence however demonstrates the Plaintiff's careful consideration in choosing the method to fund the trust as well as in selecting the underlying statistical assumptions on which contributions to the plan were ultimately based. Indeed, once the aggregate method was chosen by TI, the liabilities under that system would have accrued notwithstanding any actual payment by the Plaintiff to the fund. The evidence further shows that in the event Plaintiff or its subsidiaries had chosen not to make a contribution to the pension trust for the years 1968 and 1969, the pension's auditors would nonetheless have required that there be accrued for financial accounting purposes a significant liability to the pension trust. Additionally, the system chosen by Plaintiff is heuristic in that it adjusts automatically to correct overfunding. That self-adjusting factor is clearly evidenced by the fact that the contributions actually made by the Plaintiff ultimately reduced the "overerfunding" from approximately $19.5 million at the beginning of 1968 to approximately $4.8 million at the beginning of 1972. Hence, while the total amount of the "overfunding" was large in 1968 and 1969, the clear intent of Texas Instruments was simply to finance the fund according to the statistical assumptions painstakingly developed by Hansen Company.

Despite the "overfunding" extant in 1968 and 1969, Plaintiff has attempted to introduce evidence that adverse conditions in the stock market have nonethe-

| 4. | Jan. 1, 1968 | Jan. 1, 1969 |
|---|---|---|
| Accrued liability of the plan | $47,967,542 | $57,308,919 |
| Assets of the plan | 72,208,577 | 83,524,000 |
| Unfunded past services costs | (24,241,035) | (26,215,081) |

| | Jan. 1, 1968 | Jan. 1, 1969 |
|---|---|---|
| Percentage over-funded | 50.5% | 45.9% |

less reduced the possibility of achieving a four percent rate of return as formerly predicted by Hansen Company, and therefore, a surplus was necessary in 1968 and 1969 to correct what is expected to be a short-fall in the growth of the fund at some time in the future. Defendant correctly objected to the introduction of any testimony concerning that projected short-fall. The issues presented to this Court involve the corporate intent or attitude at the time the contributions to the fund were made and retrospective rationalizations cannot serve as a balm for any prior mistakes.

## B. INVESTMENT TAX CREDIT

During 1968 and 1969 Plaintiff's subsidiary, Geophysical Service, Inc. [a Delaware corporation hereinafter referred to as GSID], was engaged in the business of collecting, processing and selling or licensing offshore seismic information to various customers who in turn used that information to explore for oil and gas. While the information was furnished to the customer in picture form depicting the contours of the earth's different strata, the actual collection and editing process involved a complicated computer process.

The method used in collecting the seismic data needed to produce such pictures was to induce sound into the ground and then to attempt to capture the various reflected vibrations from the earth's strata in microphone-like receivers. Those receivers then transmitted the electronic impulses to recording stations where the impulses were transcribed onto magnetic computer tapes known as "field" tapes. From there the impulses recorded on the field tapes were taken to a processing center where background signals or noise were eliminated. With the retained or primary signals sharpened by the editing process, a "final" or "output" tape was produced. Using a computer, the information contained on the "output" tapes as electronic impulses was then transformed into a picture representing a vertical slice of the earth's crust.

When a customer placed an order for the information collected and processed by GSID, he received a copy of the original picture produced by the process described above, a map locating the points where the sound waves were introduced into the earth, and a report outlining the conditions under which the tests were conducted. GSID retained all field and output tapes since the original picture might be damaged and need to be reproduced, or the editing technology might advance beyond the then present state of the art, thereby making it possible to produce more accurate representations of the subterrain from the original field recordings. Information furnished to GSID's customers was licensed on a non-exclusive basis pursuant to written agreement. Generally, the customer was restricted from making the data available to any other person except those specifically exempted under the agreement.

Restrictions were considered essential by GSID since its business depended upon multiple licenses of the same data to recover its costs and to make a profit. While only two or three percent of the total sales volume of GSID and its related companies was derived from the sale or licensing of speculative data in the years 1968 and 1969, the costs incurred were substantial. In 1968 those costs were $934,070 and in 1969 they grew to $2,243,973. On its consolidated income tax returns for those years, GSID attempted to write off those expenditures as ordinary and necessary business expenses. The Internal Revenue Service determined that the costs incurred each year should be capitalized as a single item for each year and written off over a seven year period with a ten percent residual. In this case, Plaintiff seeks a refund, urging that it is entitled to the application of the Investment Tax Credit and the double declining balance method of depreciation to the total capitalized cost of the field and output tapes. The Service counters with the argument that while the Plaintiff is entitled to the Investment Tax Credit and the accelerated depreciation on the various tangible in-

gredients used in the production of the tapes, both statutes clearly do not apply to costs incurred on intangible property used to produce them.

### C. FOREIGN TAX CREDIT CARRY OVER

Geophysical Service Incorporated, a wholly owned foreign subsidiary of Plaintiff (a different corporation than GSID, hereinafter referred to GSIF) is a Western Hemisphere Trade Corporation as defined in Section 921 of the Code. During the years 1968 and 1969 the income of GSIF was included in Plaintiff's consolidated return. The Service reduced the amount of foreign taxes available for credit under Section 1503(b) of the Code by the amount of $336,777. Plaintiff acquiesces to the Service's reduction but urges that it is entitled to carry over those credits to 1969.

### IV. CONCLUSIONS OF LAW

### A. THE PENSION TRUST DEDUCTION

*THE BIG PICTURE.* Conceptually the issue before this Court with respect to the deductibility of contributions to pension trusts is easily stated in terms of the competing policy interests vying for predominance in the pension trust arena. Congress has committed itself and hence our society to provide for the elderly and incapacitated.[5] Such a commitment has been met with programs funded with private as well as public dollars. This case involves an intriguing and yet traditional American admixture of public encouragement of private investment through the use of tax incentives. Private investment in qualified pension trusts is tax deductible. Hence both the employer and employee may invest in the employee's future with pre-tax earnings and thereby be encouraged to plan for retirement or incapacity. *Gross-Given Mfg. Co. v. Klem,* 99 F.Supp. 144 (D.C.Minn.1951).

As might be expected, however, public support for the pension trust is not unlimited and therefore the laws giving effect to that support have been circumscribed by a complicated network of delimiting passages contained within section 404(a). Historically, the Service has sought to restrict the deductibility of contributions made to qualified pension plans when those plans were overfunded, but to a large extent those efforts have failed because of the peculiar wording of Section 404(a).[6] Still, in the present case, the Service is again seeking to limit Plaintiff's deductions for contributions to its pension trust urging in its attack new statutory authority and analysis to support its claim.

*THE SMALL PICTURE—THE ORDINARY AND NECESSARY LIMITATION.* Technically § 404, like Caesar's proverbial Gaul, may be divided into three parts, each representing a potential point where the Service may be able to control overfunding and, as again might be expected, each representing a separate point of defense by the Service in this case.

First, § 404(a) requires that all contributions to pension trusts be ordinary and necessary business expenses.[7] Thus, ben-

---

5. *See, e. g.,* Grants to States for Services to Aged, Blind and Disabled, 42 U.S.C.A. § 801.

6. *See, e. g., The Saalfield Publishing Co.,* 11 T.C. 756 (1948); *South Penn Oil Co. v. Commissioner,* 17 T.C. 27 (1951); *Philadelphia Suburban Transportation Co. v. Smite,* 105 F.Supp. 650 (E.D.Pa., 1952).

7. Section 404(a) reads as follows:

   *General Rule*—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections [*both of which provide that expenses must be ordinary and necessary*] they shall be deductible under this section, subject, however, to the following limitations . . . . (emphasis supplied).

efits may not be promised, costs imposed, nor financing methods adopted which are not within the vague parameters prescribed by the ordinary and necessary language incorporated by reference into Section 404(a). Elaborating on the ordinary and necessary limitation, Treasury Regulation § 1.404(a)–3(b) provides:

In no event shall costs for the purpose of Section 404(a)(1) exceed costs based upon assumptions and methods which are reasonable in view of the provisions of the coverage of the plan, the funding medium, reasonable expectations as to the effect of mortality and interest, reasonable and adequate regard for other factors such as withdrawal and deferred retirement (whether or not discounted) which can be expected to reduce costs materially, reasonable expenses of operation, and *all other relevant conditions and circumstances.* (emphasis supplied)

Moreover, the Service in Revenue Ruling 64–159 (1964–1 Cum.Bull., part 1, at 163) further attempts to highlight and define the ordinary and necessary language found in Section 404(a) by stating unequivocally that contributions to a pension trust which is fully funded are in effect *per se* extraordinary and therefore not deductible. The Service continues to urge that *per se* line of argument in the present case, and therefore only introduces evidence to show that Texas Instruments continued to contribute funds in 1968 and 1969 to a pension trust which was substantially overfunded at that time.

■ In *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933) the Supreme Court, speaking through Justice Cardozo, eschewed the rigid *per se* approach, here urged upon us by the Service, in analyzing the meaning of the language "ordinary and necessary", and reasoned instead that "[t]he standard set up by the statute is not a rule of law; it is rather a way of life [and that] [l]ife in all its fullness must supply the answer to the riddle". *Id.* at 115, 54 S.Ct. at 9. Even the Treasury Regulation promul-

gated to guide the practitioner and the courts in applying Section 404(a) manifests sensitivity to the complexity of the riddle now before this Court. Under that Regulation one is directed to consider the assumptions and methods used to derive the discount rate to be applied to the contribution in view of the benefits promised, the funding mechanisms used, the turnover and mortality variables assumed, as well as the ultimate cost of the program. See Treas.Reg. § 1.404(a)–3(b). Hence, by the terms of the Service's own regulation, as well as by the construction placed upon the meaning of ordinary and necessary by the Supreme Court, the sole fact that Texas Instruments continued to make contributions to its employee pension fund, even while that trust was overfunded, does not in itself foreclose the possibility that those contributions may be ordinary and necessary within the meaning of Section 404(a). The burden, of course, of proving facts which in light of the substantial overfunding present in this case would bring the contributions within the meaning of the ordinary and necessary language of Section 404(a) still rests with the taxpayer. *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *Tulia Feedlot, Inc. v. U. S.,* 513 F.2d 800, 805 (5th Cir. 1975).

■ Texas Instruments introduced evidence at trial to show that the assumptions underlying its contributions were derived from data organized and reduced according to the highest standards and methods of actuarial science. Indeed, the only attack made on TI's assumptions by the Service is that in retrospect the rate of return expected on the monies invested under the pension plan was underestimated and the employee turnover rate was overestimated in 1968 and again in 1969. Yet such variance is to be expected at times during the forty to sixty year lifetime over which the basic assumptions underlying TI's pension plan are to be functional. Certainly blind adherence to assumptions which are improperly derived or which become invalid predictors over the lifetime of a trust

would be persuasive evidence that contributions made upon those assumptions were extraordinary and unnecessary, but the evidence in this case demonstrated that TI was carefully attempting to hew a path through the uncertain future using computers, surveys, regression analysis and past experience as its cutting edge. While blunt, the tools used by TI are the only ones available to mortal man to predict the inscrutable future. In the instant case, it is clear that TI contributed monies to its pension fund, not in blind adherence to an arithmetic scheme, but out of a well reasoned faith that the average figures chosen as a basis for its contributions would prove accurate in the long run. See *Philadelphia Suburban Transp. Co. v. Smite*, 105 F.Supp. 650, 655 (E.D.Pa.1952).

The Court is further persuaded that the delimiting nature of the term ordinary and necessary as used within the context of Section 404(a) should be construed with sensitivity to the employer's dilemma in the pension trust area. On the one hand, a company like TI has an extraordinary responsibility to manage properly a fund over an extended period of time for the benefit of its employees, and yet on the other hand the Service would ask this Court to penalize the employer if that employer's good faith predictions proved inaccurate and it mistakenly overfunded its pension plan in the short run. *Id.* at 651. Congress could not have required that the employer should walk such a narrow and treacherous path. If there is to be error, provided it is good faith error, then let it be in favor of the employees and their pension fund. Solid financial planning with liberal safety margins should be and is the hallmark of the employee pension fund scheme envisioned by Congress. This Court shall not construe a law to fly in the face of that purpose.

I conclude therefore that the contributions in this case were ordinary and necessary within the meaning of Section 404(a) because they were based upon assumptions which were honestly, conscientiously, and scientifically derived and because they were in good faith applied in 1968 and 1969.

*THE SMALL PICTURE—THE A AND B LIMITATION.* Once the threshold issue of whether the funds contributed to a pension trust are ordinary and necessary is resolved there remain issues found in subparagraphs A, B, and C of Section 404 which further limit such contributions. Subparagraphs A and B are read together to form the second major basis for restricting employer contributions to pension fund trusts. Subparagraph A provides that up to five percent of all compensation paid to employees in a given year may be contributed to the pension trust. IRC § 404(a)(1)(A). In addition subparagraph B allows an amount necessary to fund past services cost. IRC § 404(a)(1)(B). Analytically the structure of the A plus B portion of Section 404 is basic. An amount bounded by a flat five percent of total compensation to all employees gives the taxpayer a quick and simple method for determining the extent to which he is allowed to contribute to a pension trust. Yet subparagraph B provides for greater funding where past services costs may exceed that flat percentage figure. In the event that the five percent contribution "overfunds" the pension trust the Secretary is given authority to correct that overfunding by reducing contributions in "future years". Similarly under subparagraph B, the Secretary is given authority to provide in regulations whether contributions beyond those allowed under subparagraph A are "necessary to provide . . . for [the] remaining unfunded cost" of the pension trust.

In the present case, the Service is urging that subparagraphs A and B give it authority to require TI to pay taxes in 1973 for overfunding which had taken place in 1968 and 1969. Responding to those arguments, TI asserts that the Service simply does not have the authority to eliminate any deduction for overfunding which occurred in the past, but rather it must adjust overfunding by reducing contributions only in "future

years". Beyond that, TI urges that the Service, under subparagraph B, may reduce overfunding only if it unnecessary to provide for the unfunded costs of the pension trust as provided in the regulations and that, under the facts in this case, the regulations do not provide such a limitation. Hence the two issues to be resolved under the second delimiting part of Section 404 are: first, whether the Service has authority under subparagraph A to impose taxes on past years in view of the express limitation that contributions may only be reduced in future years; and, second, whether the regulations as provided by the Secretary actually proscribe the overfunding which occurred under the facts of this case.

■ Resolving the meaning of the term *future years* in § 404(a)(1)(A), and thereby determining whether the Service has authority to reach into the past to disallow deductions for contributions to pension trusts, is a matter of first impression. Section 404 provides in part:

> In the *taxable year* when paid, if the contributions are paid into a pension trust, and if such *taxable year* ends within or with the *taxable year* of the trust for which the trust is exempt under section 501(a), in an amount determined as follows:
>
> (A) an amount not in excess of 5 percent of the compensation otherwise paid or accrued during the *taxable year* to all the employees under the trust, but such amount may be reduced for *future years* if found by the Secretary or his delegate upon periodical examination at not less than 5-year intervals to be more than the amount reasonably necessary to provide the remaining unfunded cost of past and current credits of all employees under the plan. (emphasis supplied)

Using the term "future years" following the use of the term "taxable year" four

times in the preceding several lines clearly indicates that Congress intended the Service's authority to adjust contributions already paid to begin only after the taxable year in which the overfunding took place had ended. The Service's authority to intervene and adjust contributions to pension funds is further limited by the use of the phrase *but such amount may be reduced,* modified and limited by the phrase, *amount . . . paid or accrued during the taxable year.* Because it is logically impossible to *reduce a contribution* which has already been *paid or accrued,* that amount having already been transmuted into the tangible pension monies, the Service's authority must be limited to the reduction of those monies to be paid or accrued at some future point in time.

Further support for construing the term "future years" to restrict the Service's authority to adjust contributions in past years is found in Section 404(a) and subparagraph B under that Section. As has been discussed above, the threshold determination for any contribution to a pension trust under Section 404 is that it be "ordinary and necessary". Hence the Service already has a readily available means of supervising past contributions without the need to rely upon contorting the language of Section 404(a)(1)(A) to grant power beyond that which is clearly authorized. Additional authority would be surplusage and unnecessary to the overall scheme of Section 404. I will not presume that Congress, having drafted a perfectly clear and workable method for controlling abusive pension overfunding in Section 404(a), would in the next subparagraph draft such an oddly worded provision to do exactly the same thing. Beyond that, in subparagraph B, the Service is given authority to proscribe overfunding, but only if regulations designed to accomplish that end are clearly set out beforehand.[8] Again, I can only

---

**8.** (B) any excess over the amount allowable under subparagraph (A) necessary to provide with respect to all of the employees under the trust the remaining unfunded cost of their past and current service credits distributed as a level amount, or a level percentage of compensation, over the remaining future service of each such employee, as determined under regulations prescribed by the Secretary or his delegate, but if such remaining unfunded cost with respect to any 3 individuals is more than 50 percent of such remaining unfunded cost, the

take the language in subparagraph B as another indication that Congress understood the mischief which could be created by the uncertainty of *ex post facto* determinations by the Service in connection with the overfunding of pension trusts. By requiring clear regulations to define what is "necessary to provide" for pension trust costs, the employer-taxpayer is given firmer footing on which to plan contributions in the future.

Such wording is consistent with the underlying policy objectives of Section 404 of limiting contributions to pension trusts, but in a way in which the contributor will not be penalized for good faith but mistaken over-contribution. See *Philadelphia Suburban Transp. Co. v. Smite,* 105 F.Supp. 650 (E.D.Pa.1952); *Rose Packing Co. v. Comm.,* 28 T.C. 1028, 1033 (1957). At least one commentator has criticized *ex post facto* determinations made by the Service under Section 404(c)(1)(A) when he wrote:

> Unfortunately for the employer-taxpayer the five year interval arrangement offers no assurance that either five percent or the most recently adjusted lower percentage is a dependable deduction limitation. Since the employer's return containing the required fifth-year information is not ordinarily audited for several years after it has been filed, several years' contributions would have to be made without any certainty that the selected percentage limit will not be adjusted by the Service. Beck, *Contributions to Qualified Plans: When, What, and How Much?,* 27 N.Y.U. Inst. on Federal Taxation 187 (1969)

I agree that such *ex post facto* determinations are unfortunate and indeed not authorized both because the language of subparagraph A and paragraphs surrounding the language at issue indicates that the Service may only "reduce", or as the Service urges "adjust", contributions in the future and because the underlying policy considerations of the

statute clearly support such a construction. The Service has no authority in this case to reduce contributions made by TI in 1968 and 1969 to TI's employee pension trust.

Under the A and B language, however, there remains a further delimiting feature which the Service urges may grant them authority to disallow the pension trust deductions taken by TI in 1968 and 1969. As has just been discussed, Section 404(a)(1)(B) allows the taxpayer to contribute only "any excess over the amount allowable under (A) necessary to provide [for the pension fund costs] . . . as determined under regulations prescribed by the Secretary or his delegate". The determination of whether the Service has authority to disallow contributions in 1968 and 1969 therefore turns on the regulations promulgated under that Section.

While involuted, Regulation 1.404(a)–5(c), in effect, adopts the ordinary and necessary test already analyzed above and provides in part that:

> [W]here [the aggregate method] is used, the limitation under Section 404(a)(1)(B) will be equal to the excess so computed without further adjustment on account of prior favorable experience, provided all the factors and assumptions used are reasonable in view of all applicable considerations *(See § 1.404a–3) [referring to the ordinary and necessary language in Section 404(a)]* (emphasis supplied).

Having already determined that the contributions in this case under Section 404(a) were ordinary and necessary, further analysis under a standard which is identical is unnecessary. The monies contributed to TI's pension trust, under both Section 404(a)(1)(B) and the regulations promulgated thereunder, are ordinary and necessary. *Philadelphia Suburban Transp. Co. v. Smite,* 105 F.Supp. 650, 655 (E.D.Pa.1952).

amount of such unfunded cost attributable to such individuals shall be distributed over a pe-

riod of at least 5 taxable years, or . . . ..
IRC 404(a)(1)(B).

■ *THE SMALL PICTURE—THE C LIMITATION.* Finally, Plaintiff urges that it is entitled to deduct contributions to its pension trust on the basis of subparagraph C. Without reaching the merits of Plaintiff's argument this Court finds that Plaintiff, having chosen in its income tax returns to characterize its deductions to the pension trust under the A plus B limitation, may not reevaluate its tax position and attempt *ex post facto* to recharacterize those transactions as subparagraph C deductions. See 1.404 (a)–3(c); *Commissioner v. Nat'l Alfalfa Dehydrating,* 417 U.S. 134, 149, 94 S. Ct. 2129, 40 L.Ed.2d 717 (1974). Accordingly this Court holds that while Plaintiff has valid claims with respect to the pension trust issue under Section 404(a)(1) and subparagraphs A plus B it does not have a cognizable claim under subparagraph C.

## B. INVESTMENT TAX CREDIT

In 1962 Congress enacted the Investment Tax Credit to "increase the profitability of productive investment by reducing the net cost of acquiring new equipment." *H.R.Rep. No. 1447, 87th Cong.2d Sess.* (1962–3 Cum.Bull. 403, 411). As part of the Investment Tax Credit scheme, Section 48 of the Internal Revenue Code limits the applicability of the credit to "tangible personal property." IRC § 48(a). In Section 38(b) of the Code, Congress authorized the Secretary of the Treasury to prescribe "such regulations as may be necessary to carry out the purpose of [the Investment Tax Credit] . . . ." IRC § 38(b). Pursuant to that authority the Secretary defined tangible personal property in Regulation § 1.48–1(C) as follows:

> For the purposes of this section the term 'tangible personal property' means any tangible property . . . except *inherently permanent* structures. (emphasis supplied).

Apparently realizing that a term which is defined in terms of itself has at best limited value, the Regulations continue to define the meaning of tangible property functionally, citing production machinery, printing presses, transportation and office equipment as examples of tangible property, while giving patents and copyrights as examples of intangible property. See Treas.Reg. § 1.48–1(C). Continuing its functional analysis of the tangible-intangible distinction, the Secretary concludes in Section 1.48–1(f) of the Regulations:

> Thus, in the case of a motion picture or television film or tape, the cost of the intangible property includes manuscript and screenplay costs, the costs of wardrobe and set design, the salaries of cameramen, actors, directors, etc., and all other costs properly includable in the basis of such film or tape . . . . However, if tangible depreciable property is used in the production of such intangible property, see paragraph (b)(4) of this section.

In the second major issue before this Court, Texas Instruments concedes that Regulation 1.48–1(f) describes an analogous situation to that now before this Court, but urges that it is inconsistent with the basic purpose of the Investment Tax Credit and therefore is void. The essential point of TI's argument is that intangible property used to produce tangible property should be includable in the basis of the resultant tangible property. In this case TI submits that the resultant tangible properties are the "field" and "output" tapes used to produce the maps of the earth's subterrain for sale to its customers. The Service defends on two grounds, asserting, first, that the regulation is not inconsistent with the basic policy envisioned by Congress in the Investment Tax Credit and, second, that TI may not in any case take the Investment Tax Credit because the "real" investment by TI is not in the tangible computer tapes themselves but in the seismic information which it collected: an intangible property.

■ Turning first to the validity of Regulation 1.48–1(f), this Court notes at the outset that Treasury Regulations "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes." *Bingler v. Johnson,* 394 U.S.

741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969). The dominant characteristic of the tangible-intangible distinction used in Section 48 seems to be based upon a consideration of the relative permanence of the capital property. *Cf. Alabama Display Inc. v. U. S.*, 507 F.2d 844, 846 (Ct.Cl.1975). Following that proposition one arrives at the postulate that the closer a property approaches having a permanent life, such as a copyright or a patent, the more intangible its nature, while the converse is true for tangible property.[9] Historical underpinnings of the tax credit, even traced through present policy implications, support such a distinction.

■ Throughout its consideration of the Investment Tax Credit, Congress repeatedly recognized the goals of providing for the acquisition of new equipment, plant expansion and modernization. H.R.Rep. No. 1447, 87th Cong., 2d Sess. (1962–3 Cum.Bull. 405, 411). Yet also recognized was the view that intangible property, such as patents and copyrights, should not be considered as Section 48 property and therefore should not be entitled to the investment credit. *Id.* at 516. Repeated references are made in both the Senate and House reports to the need to allow accelerated depreciation. Indeed at one point, the House Report suggests that investment in *short lived* industrial equipment should be encouraged as much as *longer lived* industrial assets. *Id.* at 413. Clearly the thrust of the investment tax credit scheme was to stimulate the economy through encouragement of investment in productive resources which tend to *wear-out* at a quicker rate than that which was recognized by depreciation then allowed by the Revenue Code. *Id.* at 413.

Additionally, it is beneficial to note the magnitude of the capital short fall now faced by our country with an understanding that it had its genesis in past years and was precisely the problem which Congress sought to correct with the Investment Tax Credit. There is no doubt, for example, that corporate demand for capital today is very high: sales of long term corporate instruments rose to extremely high levels in 1974, and sales of short term instruments rose even higher. *See, The Crunching Burden of Corporate Debt*, Bus.Week, Oct. 12, 1974 at 54. In fact, the debt-equity ration for United States manufacturing corporations has more than doubled over the past two decades—from 21% in 1955 to 44% in 1973. Address by Dr. William Freund, Vice President and Chief Economist of the New York Stock Exchange, before International Foundation of Employee Benefit Plans, Aug. 10, 1974, at 3. At least one commentator has suggested that depreciation schedules based upon historical rather than replacement costs may be the cause of lower productivity, and that more investment than that which is now taking place is required for a healthy economy. *See* Schmitz, *Facing the New Normalcy in Corporate Finance,* Financial Executive, Nov. 1974, 14 at 16; *See also, The Rising Toll of Obsolescence,* Bus.Week, Nov. 30, 1974, at 27. Further although total corporate financing in the past three years was treble that in 1961–63, manufacturer's shipments in the past three years were only double that of 1961–63. Schmitz, *supra.* This decline has been attributed in large part to obsolescence in the nation's plant and equipment. *The Rising Toll of Obsolescence,* Bus.Week, Nov. 30, 1974 at 27. From today's vantage point, the problems articulated by Congress with respect to the Investment Tax Credit in 1961 still seem very real. Industry forecasters project a required increase in private domestic investment from $202 billion in 1973 to about $360 billion in 1985. The New York Stock Exchange, *The Capital Needs and Savings Potential of the U. S. Economy: Projections Through 1985,* September, 1974; *See also* Bosworth, Dusenberry and Cannon, *Capital Needs in the Seven-*

---

9. This observation is limited to a consideration of the Investment Tax Credit issue now before this Court and should not be construed to reflect on the depreciable. nature of property involved in this case.

ties, The Brookings Institution, 1975. Drafting an investment tax credit based upon a property's relative permanence thus seems extraordinarily realistic and farsighted. Congress simply wanted to provide an incentive to invest in productive capacity over and above the historically valued depreciation allowed under the Code for those properties which would inevitably *wear out.* To provide otherwise would be to waste society's resources. Hence the central theme of Treasury Regulation, § 1.48–1(f), while admittedly dealing with a separate and distinct industry than that which is now before the Court, is an attempt by the Service to give an example of a more fundamental proposition that the intangible costs used to create tangible property are not the proper subject of the Investment Tax Credit. Intangible costs, such as labor or a patent are not inputs which wear out in the ordinary sense of those words and therefore do not require the "increased" depreciation allowed by the Credit.

In the present case, Texas Instruments collected a great deal of data on the subterrain hoping to create a product which would guide future oil prospectors to rich strikes. In the process of collecting that information TI incurred labor and material costs as well as costs properly attributable to tangible property. Only the tangible property, the computer, the truck or the microphone used in the collection process, actually would *wear out.* It is the conclusion of this Court that only that portion of the property should properly have the benefit of the Investment Tax Credit.

■ Admittedly, characterizing property as tangible or intangible on the ba-

sis of its inherent permanence is conceptually difficult and perhaps in some cases impossible. For example, how is one to separate the intangible copyright royalty from the tangible book or the intangible patent royalty from the tangible production machine? Once homogenized into the cost of a property the intangible becomes tangible; a concept becomes reality; and attribution of costs between the two become impossible. *Cf. Southern Natural Gas Co. v. U. S.,* 412 F.2d 1222, 1230, 188 Ct.Cl. 302 (1969). In *Walt Disney Productions v. United States,* 480 F.2d 66 (9th Cir. 1973) the Ninth Circuit held that copyrighted film negatives used to make movie prints were tangible property within the meaning of the Investment Tax Credit. That court further held that the intangible costs incurred in producing the negatives were to be included in the basis of the negatives and that the tax credit was to be taken against that total capitalized cost. In so holding the Ninth Circuit was heavily influenced by subsequent legislative history which in effect exempted the movie industry from the tangible-intangible distinction and nullified Regulation 1.48–1(f) with respect to that industry.[10] In reaching its decision the Ninth Circuit also reasoned that one could never distill the cost of tangible property from its intangible component. *Id.* at 68. As an example of the difficulty of making distinctions based upon the intangible nature of inputs to tangible property, the Ninth Circuit posed the following puzzle:

[I]f applied to a production machine in an automobile factory, would [§ 1.48–1(b)] deny the investment credit on all but the *material costs* of a machine

10. The Senate Finance Committee Report on the 1971 restoration of the credit referred to by the Ninth Circuit in the *Walt Disney* case reads as follows:

As previously indicated the investment credit is generally available for depreciable tangible property. Questions have arisen, however, whether motion picture and television films are tangible (as distinct from intangible) personal property eligible for the credit. A court case decided the question in favor of

the taxpayer. The committee agrees with the court that motion picture and TV films are tangible personal property eligible for the investment credit . . . *[w]ith respect to these provisions, no inference is intended as to the proper treatment of these types of property under prior* [1962] *law.* S.Rep. No. 92–437, 92nd Cong., 1st Sess., 34, 1971 U.S.Code Cong. and Admin.News p. 1941 (1971). (emphasis supplied.)

developed and patented for the use in the manufacturing plant although the amount paid to the inventor for the idea of the machine was insignificant[11] and the bulk of the costs of the machine were the ordinary labor and engineering costs of its production. (emphasis and footnote supplied)

*Id.* If by "material costs" the Ninth Circuit means tangible costs then its statement of the problem is correct and it is true that only the tangible inputs to the production of the machine would have the benefit of the Investment Tax Credit under the regulations. It is the view of this Court that the same result would issue if only the bald terms of the statute were applied for they too restrict the use of the Investment Tax Credit to tangible property. The Regulation therefore is consistent with the underlying statute. The Investment Tax Credit was designed to apply solely to capital property used in the production of other things. If labor inputs as well as other intangibles were to be included in the basis of the final productive good then the distinction between tangible and intangible property envisioned by Congress would be meaningless. There would be no *additional incentive* to purchase productive capital equipment. In no event however is the difficulty of applying a law a reason for blithely ignoring that it exists. It is this Court's view that where internal development of a capital good occurs, and the various ingredients of that capital good are initially brought together, the courts have an obligation to determine whether or not those inputs are tangible or intangible within the meaning of Section 48. See, e. g., *Panhandle Eastern Pipe Line Co. v. U. S.,* 408 F.2d 690, 699, 187 Ct.Cl. 129 (1969); *Kennecott Copper Corp. v. U. S.,* 347 F.2d 275, 294, 171 Ct.Cl. 580 (1965). Accepting any other approach would allow the taxpayer to circumvent the tangible-intangible distinction created by Section

48 by simply conceiving of a "notion" and then making certain that it would be set down on something tangible: paper, film or even electronic computer tape. It is not the "notion", however valuable to society, to which the benefit of the Investment Tax Credit is to inure; it is the tools used to bend, shape and mold that "notion" into something.

As restated then, the problem before this Court is one of attribution: what costs should be allocated to the tangible in contrast to the intangible component of the resultant property? *See* § 1.4801 (2)(f). The burden of proving facts sufficient to make such an allocation is clearly on the taxpayer. After closely reviewing the facts of this case the Court finds that the taxpayer failed to sustain its burden of proof on allocating costs between the tangible and intangible components of the resultant property and therefore must take nothing as to its Investment Tax Credit claim.

▮ Yet, beyond the initial argument that intangible inputs must be segregated from tangible inputs to take advantage of the Investment Tax Credit, the Service also advances separately and independently that Texas Instruments in reality was investing, not in tangible computer tapes, but in the intangible seismic information which it was collecting for sale to its customers. Thus, notwithstanding Plaintiff's argument that intangible inputs should be included in the basis of tangible resultant property (the computer tapes), the seismic information is said to be excludable from the benefit of the Investment Tax Credit because it itself is intangible. This Court agrees with the Service's analysis. Texas Instruments only incidentally invested in reels of virgin computer tape while seeking the intangible seismic information. Once collected, that information would and could not wear out.[12] True,

11. It is clear that Congress also meant to exclude the amount paid for the patent. H.Rep. No. 1447, 87th Cong., 2d Sess. (1962–3 Com. Bull. 403, 516).

12. To obtain a full investment credit, the tangible property as to which the credit is claimed must have an initial estimated useful life of at least eight years, and must also be used pre-

technological innovation might render the information useless, but unlike a bulldozer or a conveyor belt, the collected information would remain trapped in precisely scattered electrons forever. Evidence even demonstrates that the field tapes, once produced, were stored with the intent of reusing the data collected when advances are made in the editing process. The value and hence the purpose of TI's investment was clearly in the intangible seismic information, not in the reels of virgin tape.[13] The information, which would last forever and could be licensed repeatedly, and not the tape, which only had a finite life and a small value, was the resultant property in which TI invested. *Cf. Computing Software Inc. v. Commissioner*, 64 T.C. 223 (1975). Indeed the loss of the output tape would not be a great one to TI so long as it had access to the information in other tapes or in another form. Accordingly this Court concludes that the intent and purpose of the Texas Instrument's investment was to produce intangible information which under Section 48 is clearly not given the benefit of the Investment Tax Credit. Hence it becomes unnecessary even to reach the issue first presented herein of whether TI may capitalize intangible costs into a resultant tangible property, for the evidence certainly demonstrates and this Court holds in the alternative that the resultant property in which TI was investing is intangible information and therefore is not the proper subject for the application of the Investment Tax Credit.

■ **THE DOUBLE DECLINING BALANCE METHOD.** In a collateral but related point to the Investment Tax Credit issue, the Plaintiff urges that it should be allowed to use the double declining balance method of depreciation on the seismic information, pursuant to Section 167. As that Section only prescribes the use of the double declining balance method in connection with tangible property, and expressly excludes intangible property from its application, this Court, for reasons set forth above, holds that the Plaintiff is not entitled to that accelerated method of depreciation because (i) the taxpayer is under an obligation to distill all tangible property purportedly subject to Section 167 accelerated depreciation from other property not subject to the credit and (ii) the taxpayer has failed to sustain that burden in this case. *Pennsylvania Power & Light Co. v. U. S.*, 411 F.2d 1300, 1304, 188 Ct.Cl. 76 (1969); *Panhandle Eastern Pipe Line Co. v. U. S.*, 408 F.2d 690, 699, 187 Ct.Cl. 129 (1969).

## C. FOREIGN TAX CREDIT CARRYOVER

■ *THE BIG PICTURE.* As a United States citizen, TI is taxed on its income from all sources, whether domestic or foreign. In order to prevent double taxation on that income which is taxed by a

---

dominantly in the United States. Section 47 of the 1954 Code further provides for recapture of the investment credit during this eight year period if the property is disposed of or otherwise ceases to qualify. To determine the life or use of the seismic data by reference to the physical attributes of the tapes is both unrealistic and impractical. As an illustration, the prescribed regulatory test for determining predominant uses is physical location. Treas. Reg. § 1.48–1(9). Thus, accepting Plaintiff's approach, so long as the tapes and films were situated in the United States for more than six months of each year they would be considered predominantly used here, and this would be so even if all the data on these articles was collected, processed and used outside the United States.

13. It is clear even from a reading of TI's complaint that it intended to invest in the seismic information rather than the virgin reels of computer tape. Paragraphs 11(c) and (d) provide in part as follows:

(c) The defendant . . . erred in failing to determine that speculative data was tangible personal property which was subject to accelerated depreciation and the investment tax credit.

(d) The speculative data does constitute new tangible personal property used predominately in the United States . . . . Therefore, the investment in such tangible personal property is subject *to depreciation* . . . and the investment tax credit.

foreign country the taxpayer is allowed to take a credit against its United States taxes by the amount of the tax paid to the foreign country taxing its income. A fundamental limitation in the statutory scheme in the foreign tax credit area is that the taxpayer is not allowed a credit which would reduce the total taxes paid in any one year below that which would normally be paid if the income had been generated and taxed in the United States. That limitation may be computed in two ways: the per-country limitation and the overall-limitation. If a taxpayer elects the per-country method the limitation is computed separately as to the taxes on income in each separate foreign country from which its income is derived. If a taxpayer elects the overall method, the limitation is computed on the combined income of all its foreign source income. *See* IRC § 904(a).

A Western Hemisphere Trade Corporation (WHTC) is a particular type of corporation which by definition generates foreign sourced income and is given preferential tax treatment. Accordingly, in computing its income tax, even though at a reduced rate, the WHTC is subject to the per-country and overall-limitations of Section 904. In addition, each corporation in a consolidated group of corporations is given an opportunity either to file separate returns or one consolidated return covering the entire group. To prevent a non-WHTC corporation from taking advantage of WHTC tax advantages when a consolidated return including both types of organizations is filed, Congress has enacted Section 1503(b) which has the effect of insulating the tax credit given the WHTC from other corporations not qualifying for WHTC status.

*THE SMALL PICTURE.* GSIF, a WHTC and a subsidiary of TI, filed a consolidated income tax return with other non-WHTC corporations claiming that it was entitled to certain foreign tax credits. The Service disallowed a portion of those claims to which the Plaintiff ultimately acquiesced. Now GSIF urges that it is entitled to carry forward those claims to 1969.[14] Both prior case law and the regulations are silent on whether the carry forward is proper.

It is clear that had the Plaintiff filed its return separately from the consolidated group, it would have been entitled to carry forward any foreign tax credit. *IRC* § 904(d) The Service argues, however, that since the return was filed as a consolidated group under Section 1503(b), which contains no carry forward provision, GSIF must lose any foreign tax credits it has accumulated. I do not agree.

Subparagraph 904(g) entitled "Cross References" provides in part as follows:

> For *special rule* relating to the application of the credit provided by section 901 [foreign tax credit] in the case of affiliated groups which include Western Hemisphere trade corporations for years in which the limitation provided by Subsection (a)(2) applies, see section 1503(b). (Emphasis supplied)

Section 904 then is to be read as the operative part of the foreign tax credit scheme envisioned by Congress with reference to subparagraph 1503(b) to be made only with regard to the *special rule* relating to WHTC and consolidated returns. Our analysis must turn to the construction of the term *special rule* in subparagraph 904(g) to determine whether Congress meant to change the basic carry over provisions found in subparagraph 904(d). Our search is made easier because the term *special rule* is worded in the singular and therefore we need only search for the one rule or modification which Congress considered special in 904(g).

Section 1503(b) resulted from a Senate amendment to the House version of Public Law 86–780 (86th Congress, 2d Session). The Senate Finance Committee explained the amendment as follows:

> Under the House bill where a consolidated return is filed, foreign taxes

14. The amount claimed with respect to the carry forward is $336,777.

which cannot be credited against U.S. tax [because they exceed the 38% rate in effect for Western Hemisphere trade corporations as of the time of the Finance Committee's Report], can be used to offset U.S. taxes at 59 percent [the ordinary corporate rate then in effect] on other foreign-source income where the foreign tax rates involved are not this high. [For example, assume that the income of a Western Hemisphere trade corporation is $100 before the imposition of foreign taxes of $45. Assume another domestic corporation also earns $100 in another foreign country and is subject to the same $45 foreign tax, but that this company is not a Western Hemisphere trade corporation. The Western Hemisphere trade corporation in this case would generally be subject to a U.S. tax (before foreign tax credit) of about $38 (ignoring the surtax exemption). Therefore, in this case only $38 of the $45 of foreign taxes could be credited against U.S. tax, leaving $7 of foreign taxes which cannot be credited. In the case of the other corporation, the U.S. tax before foreign tax credit would be *$52* (again ignoring the surtax exemption). Against this could be credited the full $45 tax paid the foreign country, leaving a net of U.S. tax of $7. If the income of the two corporations in this example were included in a consolidated return, it would be possible in effect to credit the $7 of foreign tax not * * * credited in the case of the Western Hemisphere trade corporation against the $7 of U.S. tax otherwise due in the case of the corporation subject to the 52 percent tax. *To prevent this result, the amendments made by your committee provide that foreign taxes which cannot be credited against U.S. taxes in the case of Western Hemisphere trade corporations as a result of the special 14-point-tax differential*

*provided for these corporations may not be used to offset U.S. tax on other foreign-source income either in the current year or in years to which the unused credits may be carried.* This is applied only where a consolidated return is filed and only where the overall limitation is used. S.Rep. No. 1393, 86th Cong., 2d Sess., 1960–2 Cum.Bull. 874, at 878. (Emphasis supplied).

As is clear from a reading of the Senate Report, Congress intended to prevent non-WHTCs from receiving WHTC tax benefits by segregating each corporation's income from the other's when computing the foreign tax credit. It is that proposition which is the *special rule* to which subparagraph 904(g)(2) is referring.[15] Moreover the fact that the Senate Finance report specifically noted that the "14-point-tax differential provided to [WHTC] corporations may not be used to offset U.S. tax on other foreign source income *either in current year or in years to which the unused credits may be carried*" indicates that Congress contemplated that Section 1503(b) would not change the carry over expressed in Section 904(d). Accordingly this Court holds that GSIF may carry forward unused credits generated in 1968 to 1969.

### V. SUMMARY

Lest, from the length of the foregoing opinion, there be any doubt as to the holding of this Court, I provide the following summary:

1. Plaintiff-TI made ordinary and necessary contributions to its employee pension trust in 1968 and 1969.

2. Plaintiff-TI did not exceed the limitations with regard to the A and B limitation.

3. Plaintiff-TI is not entitled to the Investment Tax Credit nor the accelerated depreciation in 1968 and 1969 under the facts of this case.

---

**15.** I am pleased to note that Defendant at page 82 of its brief agrees with the Court's analysis of the Congressional intent when it writes: "the intent of Congress [is] that the foreign tax credit disallowed by the Section 1503(b) limitation not be utilized as a tax credit by non-Western Hemisphere trade corporations who [sic] file a consolidated tax return."

4. Plaintiff-TI is entitled to carry forward losses sustained by its foreign subsidiary GSIF in 1968 pursuant to Section 904(d).

### Judgment

This matter having come on for trial before the Court sitting without a jury on March 24 and 25, 1975, and the Court having rendered its findings of fact and conclusions of law on January 21, 1976, in accordance therewith it is hereby

Ordered, Adjudged and Decreed that plaintiff do have and recover of defendant for the year 1968 $4,513,709.32, consisting of an overpayment of tax in the amount of $3,778,953 and overpayment of assessed interest in the amount of $734,756.32, and that plaintiff do have and recover of defendant for the year 1969 $5,182,158.54, consisting of an overpayment of tax of $4,354,820 and an overpayment of assessed interest in the amount of $827,338.54, together with statutory interest thereon from the date, or dates, of payment, and that plaintiff do have and recover its costs in this action.